**LEVER BROTHERS CO., Appellant,**

v.

**UNITED STATES of America, et al.**

No. 87–5051.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 3, 1989.

Decided June 9, 1989.

As Amended June 9, 1989.

Lynne Darcy, New York City, with whom David M. Malone, Washington, D.C., was on the brief, for appellant.

Linda Halpern, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Joseph E. diGenova, U.S. Atty.,[*] and Royce C. Lamberth, Asst. U.S. Atty.,[*] Washington, D.C., also entered appearances for appellee.

Before WALD, Chief Judge, and WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

[*] At the time appeal was filed.

1. Lever US is a wholly-owned subsidiary of Unilever United States, Inc., itself a wholly-owned subsidiary of Unilever N.V. Lever UK is a subsidiary of Unilever PLC, which is affiliated with Unilever N.V. in some manner not precisely disclosed by the record. At oral argument, counsel for Lever US stated that Unilever PLC and Unilever N.V. were subject to common control. Thus there appears to be no dispute over the application of 19 C.F.R. § 133.21(c)(2)

**STEPHEN F. WILLIAMS, Circuit Judge:**

Two affiliated corporations, one operating in the United States and one in the United Kingdom, use the same words, Shield and Sunlight, as trademarks for products that differ materially in the two countries. The products differ because the manufacturers have adjusted them to the countries' differing tastes and conditions. Third parties have directly or indirectly acquired the UK Shield and Sunlight products and imported them to the United States over the objection of the US affiliate, the domestic markholder. Two principles of trademark law—acceptance of manufacturers' interest in signalling the character of their products and consumers' interest in trusting those signals, and the recognition that trademarks may be regional—point toward prohibiting these importations. Deference to the views of the agency entrusted with enforcement of the statute points the other way. The matter ultimately turns, however, on the interpretation of § 42 of the Lanham Act of 1946, 15 U.S.C. § 1124 (1982), and we remand to the district court for it to complete that interpretation with the benefit of any further light that § 42's legislative history and any related administrative practice may disclose.

Lever Brothers Company is a domestic corporation which we shall refer to as either Lever or Lever US. Lever Brothers Ltd. is an English corporation, affiliated with Lever US through the latter's corporate grandparent,[1] and here referred to as Lever UK. Both Lever US and Lever UK manufacture a deodorant soap under a Shield trademark and a liquid dishwashing detergent under a Sunlight trademark.

(1988), quoted at 104 below, especially in light of 19 C.F.R. § 133.2(d), defining common control as "effective control in policy and operations and.... is not necessarily synonymous with common ownership." The issue is the validity of 19 C.F.R. § 133.21(c)(2) under the statute.

In general we rely on Lever US's account of the facts; the Customs Service does not contradict it, but disclaims ability to assess its truth. Brief for Appellees at 2 n. 1.

The Shield logo on the wrapper of the two different products is virtually identical and the only difference in the appearance of each wrapper lies in fine print revealing the country of origin and, on the US version, the ingredients.[2] Compare Joint Appendix ["J.A."] 296–300. But US Shield contains a higher concentration of coconut soap and fatty acids, and thus more readily generates lather. Hockey Affidavit, J.A. 214. The manufacturing choice evidently arises in part out of the British preference for baths, which permit time for lather to develop, as opposed to a US preference for showers. *Id.* at 215. Moreover, Britons interested in a soap's lathering properties turn to "beauty and cosmetic" soaps rather than to deodorant soaps. *Id.* at 214. Further, US Shield contains an agent that inhibits growth of bacteria; Lever accounts for this difference in terms of some mix of "differing consumer preferences, climatic conditions and regulatory standards." *Id.* at 213. Finally, the two bars contain differing perfume formulas and colorants. *Id.* at 216.

The two versions of Sunlight use the same word in similar lettering. Their external appearances differ more than the two Shields, however. The UK product comes in a cylindrical drum rather than the flattened hourglass shape employed by the US version. Compare J.A. at 302 with *id.* at 304. The UK version carries the designation, "washing up liquid" rather than the US's "dishwashing liquid," and it displays at the top a royal emblem, along with the legend "By Appointment to Her Majesty the Queen." The contents of the packages differ materially. UK Sunlight is designed for water with a higher mineral content than is generally found in the United States, and therefore does not perform as well as US Sunlight in the "soft water" typical of US metropolitan areas. J.A. 217.

Consumers are apparently capable of detecting the differences between the contents of the UK and US products—once they start using them. In support of its request for a preliminary injunction, Lever US submitted letters it received from consumers expressing their rage or disappointment with what they had believed, at the time of purchase, to be a discounted version of the familiar US product. See J.A. 197–210. Lever argues that these letters evidence consumer confusion, imperiling its reputation for quality.

Third parties import UK Shield and UK Sunlight without authorization by Lever US or, so far as appears, by Lever UK.[3] Despite requests by Lever US, the Customs Service will not halt the importation. It declines to do so only because the trademarks are used abroad by an affiliate of Lever US.

Lever rests its claim that Customs is bound to seize such imports on § 42 of the Lanham Act of 1946, which provides that

> no article of imported merchandise which shall *copy or simulate the name* of the [*sic*] any domestic manufacturer, or manufacturer, or trader, ... or which shall *copy or simulate a trademark* registered in accordance with the provisions of this chapter or shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States, or that is manufactured in any foreign country or locality other than the country or locality in which it is in fact manufactured, shall be admitted to entry at any customhouse of the United States....

15 U.S.C. § 1124 (1982) (emphasis added). At its core, Lever's contention is that where affiliated domestic and foreign firms produce goods bearing the same trademark, but different in physical content, the foreign products "copy or simulate" the

---

**2.** The FDA requires that all cosmetic products have an ingredient statement. 21 C.F.R. § 701.3 (1988). The status of imports under this regulation is not before us.

**3.** The customs forms evidently are not designed to elicit any statement by a domestic trademark owner as to whether foreign affiliates have consented to importation into the US of products purchased from the foreign affiliate. Although we have found no explicit assertion of non-consent by Lever UK in the record, Lever US's theory would seem to collapse if such consent had been given. See discussion at 109–110 below.

domestic trademark, so that § 42 forbids their importation, notwithstanding the fact of affiliation.

The Customs Service rests on a regulation whose substance evidently dates back to 1936. See *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 108 S.Ct. 1811, 1827, 100 L.Ed.2d 313 (1988) (Brennan, J., concurring in part and dissenting in part). While its regulations call as a general matter for seizure of foreign-made articles bearing a trademark identical with one owned and recorded by a US corporation, see 19 C.F.R. § 133.21(b) (1988), they make a number of exceptions:

(c) *Restrictions not applicable.* The restrictions set forth in paragraphs (a) and (b) of this section do not apply to imported articles when:

(1) Both the foreign and the U.S. trademark or trade name are owned by the same person or business entity;

(2) The foreign and domestic trademark or trade name owners are parent and subsidiary companies or are otherwise subject to common ownership or control (see §§ 133.2(d) and 133.12(d));

(3) The articles of foreign manufacture bear a recorded trademark or trade name applied under authorization of the U.S. owner.[4]

(4) The objectionable mark is removed or obliterated prior to importation ...

(5) The merchandise is imported by the recordant of the trademark or trade name or his designate;

(6) The recordant gives written consent ...

(7) ... the personal exemption is claimed...

19 C.F.R. § 133.21(c) (1988). The critical clause for our purposes is subsection (c)(2), the affiliate exception.[5]

In the Customs Service's view, as embodied in the affiliate exception, goods are genuine—and thus neither copy nor simulate a domestic trademarked good—when they bear trademarks valid in their country of origin and the foreign manufacturer is affiliated with the domestic trademark holder. Where the affiliation between producers exists, Customs regards as irrelevant both physical differences in the products and the domestic markholder's nonconsent to importation.

Lever sought a preliminary injunction against the Customs Service's continued application of the affiliate exception on the ground that it violated § 42 of the Lanham Act. The district court essentially agreed with the Customs Service's interpretation of § 42. Regarding the law as clear, the court denied the request without reaching the other issues that govern an application for a preliminary injunction—the balance of hardships among the parties and the public interest. *Lever Brothers Co. v. United States*, 652 F.Supp. 403, 406–07 (D.D.C.1987); *cf. Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 673–74 (D.C.Cir.1985) (per curiam) (listing issues to be considered before granting preliminary injunction). Lever US filed a timely appeal.[6]

■ Review of the Customs Service's regulation comes to us in an unusual posture. The Service is charged with implementation of § 42 of the Lanham Act, and

---

4. In *K Mart,* the Supreme Court struck down 19 C.F.R. § 133.21(c)(3) as inconsistent with § 526 of the Tariff Act of 1930, 19 U.S.C. § 1526 (1982). *See id.* at ——, 108 S.Ct. at 1818–19; *see also id.* at ——, 108 S.Ct. at 1831 (Scalia, J., concurring in part and dissenting in part).

5. Another regulation, 19 C.F.R. § 133.12(d), evidently adopted to facilitate implementation of § 133.21(c)(2), requires that applications to record a trade name with Customs list affiliates using it abroad, and Lever US's 1986 applications did so.

6. A panel of this court denied Lever US's emergency motion for an injunction pending appeal, and held the matter in abeyance on its own motion pending Supreme Court review of another challenge to the same regulation under both the Lanham Act and the Tariff Act of 1930, 19 U.S.C. § 1526. See *Lever Brothers Company v. United States of America,* Order, No. 87–5051 (D.C.Cir. Mar. 1987). That review has now culminated in the *K Mart* decision, which upheld § 133.21(c)(2) against the Tariff Act challenge but expressly did not reach the Lanham Act claim. See *K Mart,* 486 U.S. at —— n. 3, 108 S.Ct. at 1817 n. 3.

accordingly we owe its interpretation deference. If we find, using "traditional tools of statutory construction," that Congress clearly expressed an intent on the matter, of course we give that intent effect; otherwise we must accept the Customs Service's interpretation if reasonable. See *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987). But as the substance of the disputed regulation considerably antedates the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.,* the Service appears not to have supported it with the "concise general statement of [the rule's] basis and purpose" required by § 553(c). Thus, despite the stricture of *SEC v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943), that "courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review," a precept developed in the context of adjudication but later extended to rulemaking, *see Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), we have no choice but to review without the benefit of any rulemaking record disclosing the agency's train of thought. *Cf. Women Involved in Farm Economics v. U.S. Department of Agriculture,* 876 F.2d 994, 998–1000 (D.C.Cir. 1989) (accepting counsel's post-hoc justifications when agency making rule had no duty to make a record). On the basis of the briefs before us, however, we can tentatively reach the view that the Service's construction of § 42 defeats its purpose and is therefore contrary to its intent. Our conclusion here is tentative, however, as the parties have not joined issue in any detail on the legislative history or on Customs' administrative practice, and we remand to the district court for further development of the record.

    \*    \*    \*    \*    \*    \*

The plain language and general sweep of the Lanham Act undeniably bespeak an intention to protect domestic trademark holders from foreign competitors who seek a free ride on the goodwill of domestic trademarks. But neither § 42 nor the Lanham Act as a whole draws an explicit line between goods that "copy or simulate" a trademark and ones that do not—known as "genuine" goods. We will address first the origins of the exception and a Customs claim of ratification, then the relevant judicial authority, and finally turn to factors bearing upon the correct construction but not addressed earlier.

### History of the Exception

The Service promulgated the substance of the affiliate exception in 1936 as an implementation of both the Tariff Act of 1930 and § 27 of the Trademark Act of 1905, the predecessor of § 42 of the Lanham Act. See *K Mart,* 486 U.S. at ——, 108 S.Ct. at 1827. The 1936 version was narrower than today's, as it allowed the importation of trademarked goods only if the domestic and foreign maker were "owned by the same person, partnership, association, or corporation." 108 S.Ct. at 1827 (Brennan, J., concurring in part and dissenting in part) (quoting T.D. 48537, 70 Treas.Dec. 336–337 (1936)). The Service broadened the exception in 1953 to introduce a concept of affiliation and has evidently hewed to it in substance ever since. See 108 S.Ct. at 1827–28 (Brennan, J., concurring in part and dissenting in part); see also *Vivitar Corp. v. United States,* 761 F.2d 1552, 1565–68 (Fed.Cir.1985).

In 1946 Congress enacted § 42 of the Lanham Act, substantially reenacting § 27 of the 1905 Act. At oral argument, counsel for the Customs Service appeared to argue that the reenactment ratified the affiliate exception. Such history as we have uncovered lends no support to that view. In 1944 the United States Tariff Commission (now the International Trade Commission) presented a memorandum to a subcommittee of the House Committee on Patents, then considering legislation that emerged as the Lanham Act. A passage of the memo refers to the then-existing provision allowing entry when both foreign and US trademarks are owned by the same person. *Hearing Before a Subcomm. of*

*the Comm. on Patents on H.R. 82*, U.S. Senate, 78th Cong., 2d Sess. 86–87 (1944). In a sentence that may be intended as an explanation, it notes that "the registrant's goods cannot 'copy or simulate' his own mark." *Id.* at 87.

This falls far short of ratification of the affiliate exception, at least in the broad form applied by Customs here. First, the memorandum makes no mention of the situation presented here, where a third party imports foreign goods bearing a valid foreign trademark identical to a US trademark but covering physically different goods. Second, we can find no indication that a single member of Congress, much less the committee, much less members speaking on the floor of either house, ever excavated these paragraphs from the mass in which they lay embedded.[7]

*Case Authority*

We turn first to the trio of Supreme Court cases, all revolving around face-powder, which bear upon § 42's predecessor, the almost identical § 27 of the Trademark Law of 1905: *A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923); *A. Bourjois & Co. v. Aldridge*, 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) (per curiam); and *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924). Although the cases do not control the present one, they demonstrate the Court's understanding of trademark law as intended to protect a manufacturer's reputation and goodwill and to prevent confusion among consumers. They also reflect and enforce trademark territoriality.

In *Katzel* the plaintiff (A. Bourjois & Company) was a US corporation that had purchased the US business of a French company (originally of the same name but in France succeeded by the firm of Wertheimer & Cie.), including its goodwill and trademarks. The defendant found that the exchange rate would enable her to buy "Java" face-powder from the French company, and repackage and resell it in the

United States under a label almost identical to the plaintiff US firm's and bearing the trademarked names "Java" and "Bourjois." The Second Circuit considered § 27 but construed it not to protect plaintiff because the goods were in its view "genuine." See *A. Bourjois & Co. v. Katzel*, 275 F. 539, 543 (2d Cir.1921). The Supreme Court reversed, but without explicit discussion of § 27.

As Justice Holmes put it, "There is no question that the defendant infringes the plaintiff's rights unless the fact that her boxes and powder are the genuine product of the French concern gives her a right to sell them in the present form." 260 U.S. at 691, 43 S.Ct. at 245. But the goods' being "the genuine product of the French concern" was not enough. Holmes analogized trademarks to patents. If goods were patented in the US, one who brought them abroad from someone entitled to manufacture and sell them there could not on that account sell them here over the opposition of the US patent holder. "The monopoly in that case is more extensive, but we see no significant reason for holding that the monopoly of a trade mark, so far as it goes, is less complete." *Id.* at 692, 43 S.Ct. at 245. Holmes was insistent on the inaccuracy of the representation made by the trademark. To the argument that the representation was true because the face-powder actually came from the French firm, he replied:

> But that is not accurate. It is the trade mark of the plaintiff only in the United States and indicates in law, and, it is found, by public understanding, that the goods come from the plaintiff although not made by it. . . . It stakes the reputation of the plaintiff upon the character of the goods. It was sold and could only be sold with the good will of the business that the plaintiff bought.

*Id.*

Holmes' failure to mention § 27 of the 1905 Act at all, and his reliance in the last quoted sentence on the infeasibility of the French firm's both selling and retaining the

---

7. We note that technically the passage cannot involve the affiliate situation, as the then-prevailing regulation did not reach it. We do not stress the point, however, as we doubt whether the single-entity case would be materially different so long as the foreign and domestic trademarks cover physically different goods and the importer is a third party. See 109–110 below.

US goodwill, leave the case's bearing on § 27 uncertain. But the second case of the trilogy, *A. Bourjois & Co. v. Aldridge*, 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) (per curiam), forges a link to § 27, albeit a vulnerable one. *Aldridge* appears to involve the same business transfer as lay at the root of *Katzel*. The Second Circuit described the US firm A. Bourjois & Co. as having acquired the "exclusive right to manufacture and sell in the United States any and all toilet preparations now made by [Wertheimer & Cie.]." See *A. Bourjois & Co. v. Aldridge*, 292 F. 1013, 1013–14 (2d Cir.1922) (per curiam). The sale included the trademark "Manon Lescaut," used in selling a face-powder. As in *Katzel*, an unaffiliated importer bought Manon Lescaut face-powder from the French firm and resold it in the United States under that label. The only noticeable difference between the products' packaging was small print identifying the seller. (The ingredients of plaintiff's own Manon Lescaut powder, though chemically the same as the French version, were not always bought from the French firm.) The action was brought against the Collector of Customs, however, seeking to force him to exclude the third party's product. The Second Circuit certified two questions to the Supreme Court:

(1) Is the sale in the United States of Wertheimer's Manon Lescaut powder an infringement of plaintiff's registered trade-marks?

(2) Is the collector, by section 27 of the Trade–Mark Law, required to exclude from entry genuine Manon Lescaut powder so as aforesaid made in France?

*Id.* at 1014. The government's three-page brief conceded that *Katzel* controlled. Brief for Defendant, *A. Bourjois & Co. v. Aldridge*, 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) (No. 50). The Court replied that "[t]he two questions certified by the Circuit Court of Appeals for Second Circuit are answered in the affirmative, upon the authority of *Bourjois & Co. v. Katzel*, 260 U.S. 689, [43 S.Ct. 244], the defendant not objecting." 263 U.S. at 676, 44 S.Ct. at 4.

While *Aldridge* reads § 27 to protect a domestic trademark holder from imports of trademarked merchandise that are "genuine" abroad, its precedential force is obviously weakened by the defendant's lack of opposition. Cases dealing with "parallel importation" or "gray goods" have relied on this weakness in discounting *Aldridge*. See page 108 below. In such cases, both the holder of a domestic trademark and another party import goods manufactured at the same plant abroad and physically identical. But we think the case for exclusion far stronger here than in that context: here the goods imported are not physically identical to the goods sold by the US trademark holder, and the misrepresentation implicit in the use of the US trademark is far stronger than any present in the sale of gray goods.

The defendant further stresses that in *Aldridge* there was no affiliation between the French manufacturer and the US trademark holder. It persuaded the district court that the presence of affiliation here undercut equities that it viewed as having been determinative there. 652 F.Supp. at 407. We shall return to the significance of this point in addressing Customs' policy arguments for its interpretation.

The third of the trilogy, *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924), emphasizes truthfulness. The defendant purchased genuine "Coty" products, including face-powder, repackaged them with its own binder, and sold them with clearly distinguishable labels. The Court assumed defendant's conduct to be that which was permitted by a district court decree secured by plaintiff and acquiesced in by defendant. The decree permitted defendant to use the trademarked name in the sale of its products, but only in an explanatory 18–word message, with all words in equal size, color, type and general distinctiveness, stating truthfully that the primary ingredient was Coty's and that the packer and seller, Prestonettes, was "not connected with Coty." 264 U.S. at 367, 44 S.Ct. at 351. Justice Holmes, again writing for the Court, said that this did not amount to actionable infringement:

The plaintiff could not prevent or complain of [defendant's] stating the nature

of the component parts and the source from which they were derived if it did not use the trade mark in doing so.... If the compound was worse than the constituent, it might be a misfortune to the plaintiff, but the plaintiff would have no cause of action, as the defendant was exercising the rights of ownership and only telling the truth.... A trade mark only gives the right to prohibit the use of it so far as to protect the owner's good will against the sale of another's product as his. *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97 [39 S.Ct. 48, 50–51, 63 L.Ed. 141]. There is nothing to the contrary in *Bourjois & Co. v. Katzel*, 260 U.S. 689 [43 S.Ct. 244].... When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo. *Canal Co. v. Clark*, 13 Wall. 311, 327 [20 L.Ed. 581].

264 U.S. at 368, 44 S.Ct. at 351.

■ *Prestonettes* would aid the defendant only if one denied the fact that language is a social artifact, the meaning of words determined by their use in a particular social context. In Britain a request for "beer" will yield "bitter," a sort of ale with no exact equivalent here; an American seeking our "beer" over there must ask for "lager." Because of the differing conditions in the United States and United Kingdom, and the Lever affiliates' response to these conditions in the design of their products, Shield and Sunlight likewise have different meanings in the two countries. Thus the use of the trademarks for the UK versions in the United States is simply not truthful. The reasons that persuaded Holmes to deny relief in *Prestonettes* point toward granting it here.

We do not essay any grand resolution of the face-powder trilogy's legal message. None of the cases addresses the problem of affiliates generally, nor the special problem of affiliates using identical trademarks to sell products tailored for specific national conditions and tastes. On the other hand, the cases clearly view trademarks as having specific territorial scope, and are at least consistent with the view that § 27 of the 1905 Act protects a domestic trademark holder from goods genuinely trademarked abroad but imported here by parties hoping to exploit consumer confusion between the domestic and foreign products.

The Customs Service relies heavily on a variety of "parallel importation" or "gray market" cases, where a US trademark holder and a third party import goods that are not only identical in physical characteristics but are manufactured by the same firm abroad. All of the cases except *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988), are from courts of appeal or district courts. In *K Mart*, as noted above, the Supreme Court held that in the gray goods context the affiliate exception of § 133.21(c)(2) did not violate § 526 of Tariff Act of 1930, 19 U.S.C. § 1526; it did not reach the question of the exception's validity under § 42 of the Lanham Act.[8] But in *Olympus Corp. v. United States*, 792 F.2d 315, 321 (2d Cir.1986), and *Weil Ceramics & Glass, Inc. v. Dash*, 878 F.2d 659, (3d Cir.1989), the Second and Third Circuits considered § 42 and found it no bar to the admission of gray goods. See also *Parfums Stern, Inc. v. United States Customs Service*, 575 F.Supp. 416 (S.D.Fla.1983) (denying injunction sought under Lanham Act that would have required Customs to exclude gray goods); *NEC Electronics v. Cal Circuit Abco*, 810 F.2d 1506, 1509–10 (9th Cir.1987) (finding gray goods sales not to infringe trademark holder's rights under Lanham Act § 32 (prohibiting use of mark in such a way as to cause confusion) or Lanham Act § 43 (prohibiting false designation of ori-

---

**8.** See 486 U.S. at —— n. 3, 108 S.Ct. at 1817 n. 3. *K Mart* was remanded to the district court; that court had previously dismissed COPIAT's § 42 claim in its initial decision, see *COPIAT v. United States*, 598 F.Supp. 844, 848 (D.D.C.1984), *rev'd on other grounds*, 790 F.2d 903 (D.C.Cir.1986) (not reaching § 42 claim), *rev'd in part, aff'd in part, sub* *nom. K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 108 S.Ct. 1811, 1827, 100 L.Ed.2d 313 (1988). On remand the district court vacated only that part of its 1984 opinion and order which had been overruled by the Supreme Court. *COPIAT v. United States*, No. 84–390, Order (D.D.C. Sept. 20, 1988). COPIAT did not appeal that order.

gin)); *Monte Carlo Shirt, Inc. v. Daewoo Int'l (America) Corp.*, 707 F.2d 1054, 1058 (9th Cir.1983) (holding sale of goods with genuine foreign trademark does not violate California common law of trademarks).

Where the goods bearing a foreign trademark valid abroad are physically different from the US trademarked goods, however, courts have indicated a readiness to find infringement. In *Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.*, 816 F.2d 68 (2d Cir.1987), the American trademark holder licensed a Spanish firm to make Cabbage Patch dolls and to sell them in Spain, the Canary Islands, Andorra and Ceuta Mellila. While the dolls of the US trademark owner contained English-language "adoption papers," which could be filled in and would lead to receipt of a birthday card from the US firm on the doll's "birthday," those of the Spanish licensee had Spanish-language "adoption papers" and seemingly lacked any equivalent of the birthday card system. A third-party imported and sold the Spanish version at about half the price of the US doll. The court found a violation of § 32(1)(a) of Lanham Act, 15 U.S.C. § 1114(1)(a) (1982), which prohibits use of a trademark where it "is likely to cause confusion, or to cause mistake, or to deceive." 816 F.2d at 70, 70–72. *Dial Corp. v. Encina Corp.*, 643 F.Supp. 951 (S.D.Fla.1986), also granted relief under § 32 against a firm importing goods produced abroad under a geographically limited license and physically distinct from those of the US trademark holder. Compare *Weil Ceramincs & Glass, Inc. v. Dash*, 878 F.2d 659, 668 n. 11 (3rd Cir. 1989) (holding importation of identical gray market goods did not constitute infringement under § 42, but expressly resting on absence of finding that goods were materially different).

One may distinguish *Artworks* and *Dial* on several grounds, but only one seems of much weight here. First, there the goods were produced by a foreign licensee rather than by an affiliate. But this distinction shows only that while in *Artworks* and *Dial* the foreign production was with the explicit consent of the US trademark holder, here it was with a consent inferred from the affiliation. The absence of consent to *importation* is the same. Second, *Artworks* and *Dial* rest on § 32 rather than § 42 of the Lanham Act. But the deceit that the Second Circuit found controlling in *Artworks* (and the district court in *Dial*) seems, under the face-powder trilogy, equally relevant under § 42. Third, the Second Circuit in part distinguished *Olympus* on the ground that there plaintiff had sought judicial relief against the Customs Service, to propel it into action, whereas in *Artworks* the suit ran against the importer. We have already noted the deference due Customs as the agency entrusted with enforcement of § 42 and of course we must accept its view unless it is precluded by Congress or otherwise unreasonable; we will consider below Customs' additional contention that enforcement of plaintiff's reading of § 42 would entail unmanageable administrative difficulties.

*Remaining Interpretative Concerns*

Customs' central thesis, that affiliation between the foreign producer and domestic markholder automatically defines the foreign goods as genuine, draws on an important truth—that a trademark holder cannot infringe its own mark. Thus, if a US markholder itself imports goods (or licenses another to do so), the markholder's conduct of or authorization of the importation makes the goods authentic, whether they are better, worse, or the same as the US markholder's domestic products. To the extent that the affiliate exception extends this principle to goods imported into the US by companies affiliated with the US markholder, it does nothing more than treat the two companies as being constructively one for infringement purposes. As such it seems unobjectionable.

But the exception contained in 19 C.F.R. § 133.21(c)(2) does more. Merely on the basis of affiliation between the US markholder and the foreign *producer*, it extends the non-violation that is implicit in importation by the markholder or with its consent to a radically different matter, imports *by third parties*. Inferring non-violation from that relation seems no more plausible

than an inference of consent to import from the US markholder's licensing production abroad, which the *Artworks* and *Dial* courts obviously rejected.

Apart from its attempted reliance on authority and the impossibility of self-infringement, the Customs Service asserts some policy arguments. First, it contends that because of the affiliation, the dispute is better suited for resolution "in the boardroom" than the court room. Brief for Appellees at 14. As often proves true of pleasing rhetorical phrases, this seems largely irrelevant to the issue. Even if all the Lever affiliates were collapsed into a single corporate entity, its board could not single-handedly implement a decision to limit sales of UK Shield and UK Sunlight to the United Kingdom. So long as it uses third-party middlemen and retailers, it must launch those products into the stream of commerce, with the risk that some purchasers may seek to exploit the opportunity to ride on the US trademarks' value. Indeed, at some exchange rates an arbitrageur could buy Shield and Sunlight at retail from a completely vertically integrated Lever UK and profitably resell them here. We are not told how either the US markholder or the foreign affiliate is to prevent this without invoking governmental authority, either in the form of Customs Service action or trademark-based injunctions against the importer.

Of course the "boardroom" that evidently controls both Lever US and Lever UK could solve the problem by abandoning use of the Shield and Sunlight trademarks in the United Kingdom, or at least by abandoning their use for physically distinct products. But this solution is obviously costly. The Lever affiliates have succeeded in attaching to products designed for their respective markets ordinary words that have both a favorable "spin" and a natural link to those products. Customs has offered us no shadow of a reason why it would serve any public interest implicit in § 42 to compel Lever to abandon the resulting goodwill, or (looking ahead) to refrain in the first place from establishing such goodwill by use of identical words.

The resources of English are finite and the quest for an apt word costly.

Second, Customs suggests there is a consumer interest in access to the lower-priced UK products. But trademark law inherently denies consumers access to cheap goods sailing under false colors. Further, even if we were to accept Customs' dubious premise, it points to nothing supporting the idea that the mere fact of affiliation makes it more likely than in the general case that this potential consumer loss would exceed the gain from accurate signalling of quality by means of trademarks.

Third, Customs suggests that its interpretation of the Lanham Act is an administrative necessity. The alternative to the exception, it claims, is that "Customs Service agents [would be] required to assess at the border the amount of consumer confusion and/or loss of goodwill likely to result from the importation of goods bearing genuine foreign trademarks." Brief for Appellees at 15. We think this greatly overstates the problem. No one is suggesting that Customs assess the degree of consumer confusion or loss of goodwill, only that it distinguish between identical and non-identical goods. If Lever US's submissions here are correct, that would not be difficult in a case such as this. It is hard to see why Customs' arguments calls for more than allowing it room to choose inactivity in marginal cases. *Cf. Vivitar Corp. v. United States*, 761 F.2d 1552, 1568–70 (Fed.Cir.1985) (construing § 526 of the Tariff Act as allowing Customs discretion not to act in close cases).

Lever argues that the administrative problem is completely non-existent: that US markholders will seek to block the imports of goods produced by affiliates only when in fact they are different and therefore likely to erode the US holder's goodwill. We think this somewhat oversimplifies. *K Mart* upheld the affiliate exception as applied to parallel imports (but only in reference to plaintiffs' Tariff Act challenge), approving (for example) Customs' decision to permit third-party purchasers to buy goods produced abroad by a foreign subsidiary of a US firm and import them

over the US firm's opposition (*K Mart's* "case 2b"). 486 U.S. at ——, 108 S.Ct. at 1818 (opinion of Kennedy, J.), 1821–28 (Brennan, J., concurring in part and dissenting in part). If we were to hold that Customs must bar goods produced by a US firm's affiliate when the US and foreign goods differ, and *K Mart* is extended to permit Customs to apply the affiliate exception where a US firm's *domestically* manufactured goods are identical to the imports, then US firms would have an incentive to raise false claims of non-identity.

Nonetheless, we find that the specter of false claims that possible future extensions of *K Mart* might generate is not enough to validate Customs' administrative inconvenience theory. First, *K Mart* did not evaluate the affiliate exception as against an attack under § 42. *Id.* at ——, 108 S.Ct. at 1817 n. 3. Second, the *K Mart* Court never addressed the issue of foreign surrogates competing with *domestically* produced trademarked goods. We hesitate here to evaluate the probabilities of these two extensions of *K Mart,* neither of which is before us or has been briefed. We do note, however, that if the two extensions occur and if Customs' administrative practicality argument is controlling, § 42 will have become a dead letter for a surprisingly wide range of cases, the gray-goods tail wagging the dog of flat-out deception. We hesitate to impute such broad effects to *K Mart,* even in the face of the Service's disclaimer of ability to identify what is genuine.

\*     \*     \*     \*     \*     \*

■ We think the natural, virtually inevitable reading of § 42 is that it bars foreign goods bearing a trademark identical to a valid US trademark but physically different, regardless of the trademarks' genuine character abroad or affiliation between the producing firms. On its face the section appears to aim at deceit and consumer confusion; when identical trademarks have acquired different meanings in different countries, one who imports the foreign version to sell it under that trademark will (in the absence of some specially differentiating feature) cause the confusion Congress sought to avoid. The fact of affiliation between the producers' in no way reduces the probability of that confusion; it is cer-

tainly not a constructive consent to the importation. The cases are entirely congruent with this view. Customs' assertion of administrative difficulties appears overdrawn, and in any event would seem to justify no more than inaction in those cases that are close on the factual issue of product identity. Thus, despite the deference we owe Customs under *Chevron,* we believe that the affiliate exception does not square with § 42.

For now, however, our conclusion must remain provisional. Neither party has briefed the legislative history nor administrative practice in any detail. As we did in *Abourezk v. Reagan,* 785 F.2d 1043, 1055–56 (D.C.Cir.1986), *aff'd by an equally divided court,* 484 U.S. 1, 108 S.Ct. 252, 98 L.Ed.2d 1 (1987), we adopt a reading of the statute tentatively, and reverse and remand to the district court so that the parties may join issue on those points. Subject to some persuasive evidence running against our tentative conclusion, we must say that Lever's probability of success on its legal argument is quite high; at this preliminary stage we go no further. We of course express no opinion on the weights to be accorded to the various equitable elements that the district court may have to balance if, on further submissions, that probability is established.

*So ordered.*