**LEVER BROTHERS COMPANY,**
Appellee,

v.

**UNITED STATES of America,
et al., Appellants.**

No. 92–5185.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 27, 1992.

Decided Jan. 15, 1993.

Daniel J. Standish, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John D. Bates and R. Craig Lawrence, Asst. U.S. Atty., Washington, DC, were on the brief, for appellants.

Lynne Darcy, New York City, with whom William K. Wells, Washington, DC, was on the brief, for appellee.

Diane Heiman, Washington, DC, was on the brief for amicus curiae Nat. Consumers League.

William H. Allen, Eugene A. Ludwig, and Curtis A. Bradley, Washington, DC, were on the brief for amicus curiae Coalition to Preserve the Integrity of American Trademarks.

Elliot Bredhoff, Washington, DC, was on the brief for amicus curiae Oil, Chemical and Atomic Workers Intern. Union, AFL–CIO.

Stephen Kurzman, Washington, DC, was on the brief for amicus curiae American Free Trade Ass'n.

Richard Kelly, New York City, was on the brief for amicus curiae National Ass'n of Catalog Showroom Merchandisers.

Robert W. Steele and Cheryl M. Browning, Washington, DC, were on the brief for amicus curiae Kmart Corp.

Before MIKVA, Chief Judge, and SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

The District Court entered a judgment invalidating the "affiliate exception" of 19 C.F.R. § 133.21(c)(2) (1988) as inconsistent with the statutory mandate of the Lanham Act of 1946, 15 U.S.C. § 1124 (1988), prohibiting importation of goods which copy or simulate the mark of a domestic manufacturer, and issued a nationwide injunction barring enforcement of the regulation with respect to *any* foreign goods bearing a valid United States trademark but materially and physically differing from the United States version of the goods. The United States [1] appeals. We conclude that the District Court, obedient to our limited remand in a prior decision in this same cause, properly determined that the regulation is inconsistent with the statute. However, because we conclude that the remedy the District Court provided is overbroad, we vacate the judgment and remand for entry of an injunction against allowing the importation of the foreign-produced Lever Brothers brand products at issue in this case.

I. BACKGROUND [2]

Lever Brothers Company ("Lever US" or "Lever"), an American company, and its British affiliate, Lever Brothers Limited ("Lever UK"), both manufacture deodorant soap under the "Shield" trademark and hand dishwashing liquid under the "Sunlight" trademark. The trademarks are registered in each country. The products have evidently been formulated differently to suit local tastes and circumstances. The U.S. version lathers more, the soaps smell different, the colorants used in American "Shield" have been certified by the FDA whereas the colorants in British "Shield" have not, and the U.S. version contains a bacteriostat that enhances the deodorant properties of the soap. The British version of "Sunlight" dishwashing soap produces less suds, and the American version is formulated to work best in the "soft water"

available in most American cities, whereas the British version is designed for "hard water" common in Britain.

The packaging of the U.S. and U.K. products is also somewhat different. The British "Shield" logo is written in script form and is packaged in foil wrapping and contains a wave motif, whereas the American "Shield" logo is written in block form, does not come in foil wrapping and contains a grid pattern. There is small print on the packages indicating where they were manufactured. The British "Sunlight" comes in a cylindrical bottle labeled "Sunlight Washing Up Liquid." The American "Sunlight" comes in a yellow, hour-glass-shaped bottle labeled "Sunlight Dishwashing Liquid."

Lever asserts that the unauthorized influx of these foreign products has created substantial consumer confusion and deception in the United States about the nature and origin of this merchandise, and that it has received numerous consumer complaints from American consumers who unknowingly bought the British products and were disappointed.

Lever argues that the importation of the British products was in violation of section 42 of the Lanham Act, 15 U.S.C. § 1124 which provides that with the exception of goods imported for personal use:

[N]o article of imported merchandise which shall copy or simulate the name of the [sic] any domestic manufacture, or manufacturer ... or which shall copy or simulate a trademark registered in accordance with the provisions of this chapter ... shall be admitted to entry at any customhouse of the United States.

*Id.* The United States Customs Service ("Customs"), however, was allowing importation of the British goods under the "affiliate exception" created by 19 C.F.R. § 133.-21(c)(2), which provides that foreign goods bearing United States trademarks are not forbidden when "[t]he foreign and domestic

---

**1.** We use the terms "the United States" and "appellants" collectively herein to denominate the United States of America, the Secretary of the Treasury, and the Commissioner of Customs.

**2.** We present an abbreviated background as we have already provided some detail in our prior opinion. *Lever Bros. Co. v. United States,* 877 F.2d 101 (D.C.Cir.1989) ("*Lever I*").

trademark or tradename owners are parent and subsidiary companies or are otherwise subject to common ownership or control." [3]

In *Lever I,* we concluded that "the natural, virtually inevitable reading of section 42 is that it bars foreign goods bearing a trademark identical to the valid U.S. trademark but physically different," without regard to affiliation between the producing firms or the genuine character of the trademark abroad. 877 F.2d 101, 111 (D.C.Cir. 1989). In so concluding, we applied the teachings of *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under the *Chevron* analysis, if Congress has clearly expressed an intent on a matter, we give that intent full effect (Step One of *Chevron*). If there is any ambiguity, we accept Customs' interpretation, provided only that it is reasonable (Step Two of *Chevron*). *See Lever I,* 877 F.2d at 105 (citing *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781). The *Lever I* panel found the present controversy to survive barely *Chevron* Step One and "provisional[ly]" concluded that the affiliate exception is inconsistent with section 42 with respect to physically different goods.[4] The "provisional" qualifier on our determination of the invalidity of the exception was a very limited one. Noting that "neither party has briefed the legislative history nor administrative practice in any detail," we adopted the apparently controlling reading of section 42 only "tentatively" and remanded the case to the District Court to allow the parties to "join issue on those points." *Lever I,* 877 F.2d at 111. The panel in *Lever I* thus created a very small window of opportunity for the government to establish that the affiliate exception regulation was consistent with section 42 of the Lanham Act. At that time we said, "[s]ubject to some persuasive evidence running against our tentative conclusion, we must say that Lever's probability of suc-

cess on its legal argument is quite high." *Id.*

Our task today is clearly circumscribed. Under the "law of the case" doctrine, any determination as to an issue in the case which has previously been determined is ordinarily binding upon us. We explained the reasons for this in *Laffey v. Northwest Airlines, Inc.,* 642 F.2d 578 (D.C.Cir.1980):

> An appellate court also is normally bound by the law of the case it established on a prior appeal, and for a very sound reason. If justice is to be served, there must at some point be an end to litigation; on that account, the power to recall mandates should be exercised sparingly. To warrant divergence from the law of the case, a court must not only be convinced that its earlier decision was erroneous; it must also be satisfied that adherence to the law of the case will work a grave injustice.

*Id.* at 585 (footnotes omitted). Because no reason exists in this case to avoid application of the general rule, we are bound by this Court's prior determinations concerning the application of the *Chevron* doctrine.

After reviewing the submissions of the parties, the District Court found that Customs' administrative practice was "at best inconsistent" and, in any event, had "never addressed the specific question of physically different goods that bear identical trademarks." *Lever Bros. Co. v. United States,* 796 F.Supp. 1, 5 (D.D.C.1992). The District Court concluded that "section 42 ... prohibits the importation of foreign goods that ... are physically different, regardless of the validity of the foreign trademark or the existence of an affiliation between the U.S. and foreign markholders." *Id.* The court accordingly concluded that "[n]either the legislative history of the statute nor the administrative practice of the Customs Ser-

---

**3.** This case does not involve a dispute between corporate affiliates. Neither Lever US nor Lever UK has authorized the importation which is being conducted by third parties. *See Lever I,* 877 F.2d at 103.

**4.** In *Lever I,* we expressly recognized that our decision was not in conflict with the Supreme Court's decision in *Kmart Corp. v. Cartier Inc.,*

486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988), which upheld the affiliate exception against a challenge based on section 526 of the Tariff Act of 1930, 19 U.S.C. § 1526 (1988), but "did not reach the question of the exception's validity under section 42 of the Lanham Act." *Lever I,* 877 F.2d at 108 & n. 8.

vice clearly contradicts the plain meaning of section 42" and granted summary judgment against the government. *Id.* at 13.

By way of remedy, the District Court enjoined Customs "from enforcing 19 C.F.R. § 133.21(c)(2) as to foreign goods that bear a trademark identical to a valid United States trademark but which are materially, physically different." *Lever Bros. Co.*, 796 F.Supp. at 6.

## II. ANALYSIS

▮▮▮ Here the specific question at Step Two of *Chevron* is whether the intended prohibition of section 42 admits of an exception for materially different goods manufactured by foreign affiliates. We apply a very limited Step Two *Chevron* analysis, *see Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781, because we previously concluded that the intent of Congress is virtually plain. *Lever I*, 877 F.2d at 104–05. The government bears a heavy burden in attempting to overcome the apparent meaning of the statute. In *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982), the Supreme Court held that when Congress's "will has been expressed in reasonably plain terms, 'that language must ordinarily be regarded as conclusive.'" *Id.* at 570, 102 S.Ct. at 3249 (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)). A presumption in favor of reasonably clear statutory language will be disrupted only if there is a "'clearly expressed legislative intention' contrary to that language." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987) (quoting *United States v. James*, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986)). When we remanded this case, we indicated that the Government could not prevail unless it produced "persuasive evidence" rebutting our tentative reading of the statute, *Lever I*, 877 F.2d at 111, because the affiliate exception appears to contradict the clear implication of the language of section 42. The legislative history and administrative practice before us, as before the District Court, will not perform that onerous task.

### A. *Legislative History and Administrative Practice Prior to Enactment of Lanham Act*

The first federal statute regulating the importation of trademarked merchandise was enacted in 1871. It prohibited the importation of "watches, watch cases, watch movements, or parts of watch movements, of foreign manufacture, which shall copy or simulate the name or trade-mark of any domestic manufacturer," unless the domestic manufacturer was the importer. Act of March 3, 1871, ch. 125, § 1, 16 Stat. 580. Little legislative history accompanied the 1871 Act as the final legislation was adopted without debate in either house of Congress. *See* Cong. Globe, 41st Cong., 3d Sess. 1926, 1994 (1871). The administrative record is also sparse, but it does make clear that the domestic manufacturer was to have complete control over the importation of watches bearing its trademark. *See* T.D. 899 (1871) (implementing the legislation); T.D. 912 (1871) (registering trademarks of National and American watch companies); T.D. 1428 (1873) (reprimanding customs collectors for lack of enforcement).

In 1883, Congress amended the law to extend trademark protection to all kinds of domestic merchandise. The amended statute provided that "[n]o watches, watchcases, watch-movements, or parts of watch-movements, or any other articles of foreign manufacture" that simulated or copied the trademark of a domestic manufacturer would be allowed entry. 22 Stat. 488, 490 (1883). Although the phrase "any other articles of foreign manufacture" was added at conference, the conference report does not explain the addition. *See* 14 Cong.Rec. 3713 (1883). The Treasury Department ("Treasury") interpreted the 1883 statute to prohibit foreign manufacturers from importing goods that an American manufacturer had requested to be manufactured abroad on its behalf and stamped with its trademark:

The law prohibits the importation of articles copying or simulating the name or trade-mark of any domestic manufacture, unless the domestic manufacturer be the importer. Merchandise imported for you would not, of course, be imported by the domestic manufacturer, even if intended ultimately for his use, and therefore would not be admitted if it copied or simulated the name or trade-mark of the domestic article.

T.D. 6270 (Mar. 26, 1884).

Section 7 of the Tariff Act of 1890 revised the protection accorded to domestic merchandise, providing in relevant part, that "no article of imported merchandise which shall copy or simulate the name or trade-mark of any domestic manufacture or manufacturer, shall be admitted to entry at any custom-house of the United States." 26 Stat. 567, 613 (1890). Unlike the earlier provisions, this statute did not include an exception for foreign merchandise imported by the domestic trademark owner, nor was any provision made for entry with the domestic trademark owner's consent. *See id.* It is unclear from the legislative history why Congress did not include special language allowing importations by the domestic trademark owner. It is clear, however, that the domestic trademark owner still retained effective control over the importation of goods bearing its trademark since *all* foreign merchandise bearing its mark was barred from entry.

The 1890 trademark importation provision was reenacted with almost identical language in 1894. Tariff Act of 1894, § 6, 28 Stat. 547. An 1897 reenactment expanded the sweep of the provision to prohibit the entry of articles marked in a manner "calculated to induce the public to believe that the article is manufactured in the United States." Tariff Act of 1897, § 11, 30 Stat. 207. Although the legislative history is again sparse, it appears the language was added to provide further protection to the public against deceptive marks. *See* 4 Treas.Dec. 506, 508 (1901) (ruling that even if Customs found a recorded trademark to be invalid, foreign merchandise must nevertheless be excluded if bottled or labeled so as to lead public to believe it was manufactured in United States).

Section 27 of the Trade–Mark Act of 1905, 33 Stat. 724, 730 (1905), amplified governmental protection of trademarks against imports. Trademark protection was extended to all trademarks registered with the then Patent Office. Certain foreign interests were allowed to register their trademarks in the United States, and "traders" as well as manufacturers were given import protection. Again, however, there was no mention of anything akin to the affiliate exception.

In *Fred Gretsch Manufacturing Co. v. Schoening*, 238 F. 780 (2d Cir.1916), the Second Circuit held that section 27 did not prohibit a third party from importing violin strings manufactured in Germany that bore a trademark registered in the United States by an American who had contracted to be the exclusive agent for the sale of the strings in the United States. The Treasury Department interpreted this decision narrowly and instructed local customs officers that this opinion was "to be applied only to cases where the mark covered by the United States registration is one which was adopted and is used by a foreign manufacturer upon merchandise manufactured by him, and the registration of which in the United States is to protect and cover the foreign article when sold in this country." T.D. 37021, 32 Treas.Dec. 203, 204 (1917).

The Supreme Court interpreted section 27 more broadly. In *A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), the Court held that a third party could not import a face powder manufactured in France when the plaintiff owned the United States trademarks for the product, even though the product sold was "the genuine product of the French concern...." *Id.* at 691, 43 S.Ct. at 245. The Supreme Court concluded that even an authentic foreign trademark on "genuine" merchandise may infringe a registered United States trademark. In another case that year involving the same Bourjois company, the Supreme Court held in a per curiam memorandum that third-party importation of goods bearing an authentic

identical foreign trademark infringed the United States trademark owner's rights under section 27 and must be excluded from entry by Customs. *A. Bourjois & Co. v. Aldridge*, 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) (answering questions certified to it by the Second Circuit at 292 F. 1013 (2d Cir.1922)).

Until 1936, the regulations implementing section 27 quoted the statute, then provided for an absolute ban on imports bearing trademarks that copied or simulated United States marks. *See, e.g.*, T.D. 26198, 9 Treas.Dec. 48 (1905); T.D. 27416, 11 Treas. Dec. 823 (1906); T.D. 29975, 18 Treas.Dec. 116 (1909). In 1936 the Treasury Department adopted new regulations implementing section 27 in light of *Aldridge. See* T.D. 48537, 70 Treas.Dec. 336 (1936). Section 518(b) of the regulations stated that a foreign mark, even if a "genuine trademark ... in a foreign country," shall be deemed to "copy or simulate" a United States mark if the foreign mark is "identical with a trade-mark ... protected by the laws of the United States." *Id.*

Section 518(b) of the 1936 regulations also included a "same person" exception, the first precursor of the affiliate exception:

> However, merchandise manufactured or sold in a foreign country under a trademark or trade name, which trade-mark is registered and recorded, shall not be deemed for the purpose of these regulations to copy or simulate such United States trade-mark or trade-name if such foreign trade-mark or trade-name and such United States trade-mark or trade-name are owned by the same person, partnership, association, or corporation.

*Id.* The regulation did not explain the source of this exception, and there is no evidence that Customs considered the issue of physically different imports.

Several conclusions can be drawn from the pre-Lanham Act legislative history and administrative practice. First, at least until 1936, protection from unauthorized importation was consistently based upon ownership of a United States trademark, not upon the nature of the relationship between the trademark owner and the foreign producer. Second, as trademark law became more international, the trend was toward greater protection from foreign importation. Third, although the 1936 regulations implemented the first version of the affiliate exception, the specific question of materially different goods is nowhere addressed.

### B. *Legislative History of Section 42 of Lanham Act*

In the late 1930s and early 1940s, Congress considered a wholesale revision and codification of the United States trademark laws, resulting in the Lanham Trade–Mark Act of 1946. In 1944, the Tariff Commission submitted a memorandum to the Senate Subcommittee on Patents which, after discussing the legislative and administrative history of section 27, stated that "in the light of the Supreme Court's decision in the *Bourjois* case, ... Section 27 of the Trade–Mark Act of 1905 prohibits the entry of all articles bearing marks which infringe registered trade-marks." *Hearings on H.R. 82 Before the Subcomm. of the Senate Comm. on Patents*, 78th Cong., 2d Sess. 86 (1944) (hereinafter *"1944 Hearings"*). The memorandum explicitly stated that the 1905 Act's phrase "all articles" included "articles identical with those sold by the registrant under his mark and bearing identical trade-marks." *Id.* The memorandum then added: "However, section 27 does not apply to the registrant's own merchandise, *i.e.*, merchandise of the registrant bearing the registrant's mark, which mark has been applied by or for the account of the registrant." *Id.*

In *Lever I*, we concluded that the Tariff Commission's memorandum "falls far short of ratification of the affiliate exception, at least in the broad form applied by Customs here." 877 F.2d at 106. We noted two shortcomings with reliance on this memorandum. First, the memorandum refers to "articles identical to those sold by the registrant," but "makes no mention of the situation presented here, where a third party imports foreign goods bearing a valid foreign trademark identical to a US trade-

mark but covering physically different goods." *Id.* Customs failed to respond to this point on remand, and for good reason: the 1944 memorandum does not address the distinction between identical and materially different merchandise.

Second, we stated that "we can find no indication that a single member of Congress, much less the committee, much less members speaking on the floor of either house, ever excavated these paragraphs from the mass in which they lay embedded." *Id.* The United States responds to this by noting that Senator Pepper, Chairman of the Subcommittee, requested the memorandum to be made part of the record, *1944 Hearings* at 83, from which it infers congressional awareness of Customs' policy. We conclude that this evidence is insufficient to meet our earlier stated objection. The routine insertion into the record of an agency's prepared hearing testimony is at best minuscule evidence that this testimony reflected shared congressional intent at the time of enactment.

It is also noteworthy that the 1944 memorandum does not refer to "affiliates" or "closely affiliated" companies, but only to the importation of one's "own" merchandise. In short, there is nothing in the record concerning the Lanham Act indicating that Congress contemplated—much less intended to allow—an affiliate exception. More to the point, there is no evidence that Congress intended to allow third parties to import physically different trademarked goods that are manufactured and sold abroad by a foreign affiliate of the American trademark holder.

C. *Legislative History and Developments Since Passage of Lanham Act*

The Treasury Department's administrative practice after passage of the Lanham Act has been inconsistent. The 1936 regulations remained in effect until 1953, when the Department briefly adopted a "related companies" exception. *See* T.D. 53399, 88 Treas.Dec. 376, 384 (1953). There was no indication that this regulation took cognizance of physically different goods. In any event, Treasury abandoned the related-companies exception in 1959 because it was inconsistent with section 42. T.D. 54932, 94 Treas.Dec. 433 (1959), 24 Fed.Reg. 7522 (Sept. 18, 1959). There is some evidence that Customs continued to apply the related-companies exception, even after the Customs regulations were returned to their earlier formulation, although apparently only to identical "gray market" goods. *See Kmart Corp. v. Cartier, Inc.,* 486 U.S. 281, 311, 108 S.Ct. 1811, 1827, 100 L.Ed.2d 313 (1988).

In the 1950s, several attempts were made to enact the affiliate exception into law. *See* H.R. 7234, 86th Cong., 1st Sess. 3 (1959); H.R. 11453, 84th Cong., 2d Sess. 1 (1956) (adding "common control" and "related company" exceptions to section 42; never reported out of committee); H.R. 9476, 83d Cong., 2d Sess. 19 (1954); S. 2540, 83d Cong., 2d Sess. 9 (1954); *Hearings on H.R. 9476 Before the Comm. on Ways and Means,* 83d Cong., 2d Sess. 9 (1954) (removing Treasury's affiliate exception proposal by unanimous consent). None of these bills were passed; furthermore, none of them suggest that physically different infringing imports would be permitted.

After Congress repeatedly considered and failed to enact the affiliate exception, the Treasury Department revived the exception. In 1972 the affiliate exception was adopted in the form at issue here. *See* 37 Fed.Reg. 20677 (1972). Under the 1972 regulations, section 42's protections were rendered inapplicable where:

(1) Both the foreign and the U.S. trademark or trade name are owned by the same person or business entity;

(2) The foreign and domestic trademark or trade name owners are parent and subsidiary companies or are otherwise subject to common ownership or control;

(3) The articles of foreign manufacture bear a recorded trademark or trade name applied under authorization of the U.S. owner.

19 C.F.R. § 133.21(c) (citations omitted).[5]

Neither the notice proposing the regulations, 35 Fed.Reg. 19269 (1970), nor the

---

**5.** In *Kmart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988), the Su-

final notice adopting them, T.D. 72–266, 6 Cust.Bull. 538 (1972), explained their rationale. The statement accompanying the final rule contained no response to objections raised by several companies and associations.

Customs has not even adhered consistently to its own 1972 regulations. In *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42 (2d Cir.1983), the Department of Justice and Customs filed an *amicus curiae* brief urging that import protection be provided to exclude parallel imports of identical foreign goods made by a company affiliated with the U.S. trademark owner. At that time, Customs took the position that "neither the legislative reports nor the congressional debate contain any clear evidence of a legislative intent to deny trademark protection where the owner of the U.S. mark is owned or controlled by the foreign manufacturer of the trademarked goods." Brief of the United States as *Amicus Curiae* at 8, *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42 (2d Cir.1983).

The United States denounces its *Bell & Howell* brief now on the grounds that Customs signed the brief without the knowledge or approval of the Treasury Department, and deems it irrelevant because it never resulted in a change to the regulations at issue in this case. We stress that monumental inferences cannot be drawn from inconsistent litigating positions taken by a large agency, but the Customs Service's position in favor of excluding imports in *Bell & Howell* is evidence of Lever's claim that Customs' administrative policy has been inconsistent. And Customs' assertion in the *Bell & Howell* brief that the legislative history of the Lanham Act contains no clear evidence in support of the affiliate exception is undeniably relevant

given that Customs defends the opposite position here.

In 1978, Congress added an exception to section 42 for goods imported for personal consumption. Customs Procedural Reform and Simplification Act of 1978, 19 U.S.C. § 1526(d) (1978). However, neither the 1978 amendment nor the accompanying legislative history sheds any light on the application of section 42 in general, or the affiliate exception in particular. *See, e.g.*, S.Rep. No. 778, 95th Cong., 2d Sess. 22 (1978); H.R.Rep. No. 1517, 95th Cong., 2d Sess. 16 (1978); H.R.Rep. No. 621, 95th Cong., 1st Sess. 26 (1977), U.S.Code Cong. & Admin.News 1978, p. 2211.

In 1984, Congress enacted the Trademark Counterfeiting Act of 1984, 18 U.S.C. § 2320 (1984). That statute, however, was a criminal statute and did not take the form of an amendment to section 42. Thus, any views expressed in the legislative history of that statute "form a hazardous basis for inferring the intent" of the Congress that enacted section 42. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117, 100 S.Ct. 2051, 2060, 64 L.Ed.2d 766 (1980). In any event, the legislative history accompanying the 1984 Act does not address the question of the importation of physically different trademarked goods manufactured by affiliated companies.

Customs' main argument from the legislative history is that section 42 of the Lanham Act applies only to imports of goods bearing trademarks that "copy or simulate" a registered mark. Customs thus draws a distinction between "genuine" marks and marks that "copy or simulate." A mark applied by a foreign firm subject to ownership and control common to that of the domestic trademark owner is by definition "genuine," Customs urges, regardless of whether or not the goods are identical.

---

preme Court struck down 19 C.F.R. § 133.-21(c)(3), which allowed the importation of foreign-made goods where the United States trademark owner has authorized the use of the mark, as in conflict with the unequivocal language of section 526 of the Tariff Act. Section 526 prohibits the importation of "any merchandise of foreign manufacture" bearing a trademark "owned by" a citizen of, or by a "corporation ...

organized within, the United States" unless written consent of the trademark owner is produced at the time of entry. 19 U.S.C. § 1526. By a different majority, the Supreme Court upheld 19 C.F.R. § 133.21(c)(2), the regulation at issue here, as consistent with section 526. As we noted above, the *Kmart* case did not address the validity of these regulations under the Lanham Act. *See supra* n. 4.

Thus, any importation of goods manufactured by an affiliate of a U.S. trademark owner cannot "copy or simulate" a registered mark because those goods are *ipso facto* "genuine."

This argument is fatally flawed. It rests on the false premise that foreign trademarks applied to foreign goods are "genuine" in the United States. Trademarks applied to physically different foreign goods are not genuine from the viewpoint of the American consumer. As we stated in *Lever I:*

> On its face ... section [42] appears to aim at deceit and consumer confusion; when identical trademarks have acquired different meanings in different countries, one who imports the foreign version to sell it under that trademark will (in the absence of some specially differentiating feature) cause the confusion Congress sought to avoid. The fact of affiliation between the producers in no way reduces the probability of that confusion; it is certainly not a constructive consent to importation.

877 F.2d at 111.

There is a larger, more fundamental and ultimately fatal weakness in Customs' position in this case. Section 42 on its face appears to forbid importation of goods that "copy or simulate" a United States trademark. Customs has the burden of adducing evidence from the legislative history of section 42 and its administrative practice of an exception for materially different goods whose similar foreign and domestic trademarks are owned by affiliated companies. At a minimum, this requires that the specific question be addressed in the legislative history and administrative practice. The bottom line, however, is that the issue of materially different goods was not addressed either in the legislative history or the administrative record. It is not enough to posit that silence implies authorization, when the authorization sought runs counter to the evident meaning of the governing statute. Therefore, we conclude that section 42 of the Lanham Act precludes the application of Customs' affiliate exception

with respect to physically, materially different goods.

## IV. SCOPE OF INJUNCTION

The United States alternatively argues that this Court should vacate the District Court's injunction that applies to materially different goods other than those directly at issue in this case. The District Court's injunction provides that the Customs Service is "enjoined from enforcing [the common ownership or control provision] as to foreign goods that bear a trademark identical to a valid United States trademark but which are materially, physically different." *Lever Bros. Co. v. United States,* 796 F.Supp. 1, 5 (D.D.C.1992).

The United States points out that this suit was brought by a single company, proceeding solely on its own behalf, to protect two specific trademarks. Lever never asked the District Court to enjoin Customs from applying the affiliate exception to other trademarks or other companies, nor did Lever seek to certify this suit as a class action. In its prayer for relief, Lever asked only that the Customs Service be permanently enjoined "from enforcing said regulations with respect to plaintiff's 'Shield' and 'Sunlight' trademarks, and directing defendants to exclude from entry into the United States any foreign-manufactured merchandise and material bearing said trademarks." Complaint at 7. To be sure, Lever did include boilerplate language requesting that the court award "such other and further relief as the Court may deem just and proper," *id.* at 8, but this is too slender a reed upon which to rest a nationwide injunction under the facts of this case. We therefore conclude that Lever is entitled only to that relief specifically sought in its complaint, namely, that Customs be enjoined from allowing the importation of Lever's "Shield" and "Sunlight" trademarks.

## V. CONCLUSION

For the foregoing reasons, we affirm the District Court's ruling that section 42 of the Lanham Act, 15 U.S.C. § 1124, bars the importation of physically different foreign

goods bearing a trademark identical to a valid U.S. trademark, regardless of the trademark's genuine character abroad or affiliation between the producing firms. Injunctive relief, however, is limited to the two products which were the subject of this action. We therefore vacate the District Court's prior order to the extent that it renders global relief and remand for the entry of an injunction consistent with this opinion.

*So ordered.*