**PHILIP MORRIS INCORPORATED,**
Plaintiff,

v.

**ALLEN DISTRIBUTORS, INC.; Allen Food Mart, Inc.; Richard Allen; Cindy Allen; Blue Grass Distributors, Inc.; Brian Cooper; Kocolene Marketing Group, Inc.; AF & E, Inc.; Joe Melton; and John Does 1 through 10, Defendants.**

No. IP 99–0281–C–B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 4, 1999.

Samuel D. Rosen, Paul Hastings Janofsky & Walker, New York City, David O. Tittle, Bingham Summers Welsh & Spilman, Indianapolis, IN, for plaintiff.

Barry M. Boren, Miami, FL, Matthew J. Fairshter, Fairshter & Associates, Pasadena, CA, Donald Knebel, Barnes & Thornburg, Indianapolis, IN, John D. Nell, Wooden McLaughlin & Sterner, Indianapolis, IN, Brian W. Welch, McHale Cook & Welch, Indianapolis, IN, for defendant.

### ENTRY ADDRESSING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

BARKER, Chief Judge.

Plaintiff, Philip Morris Incorporated ("Philip Morris"), brings this action for injunctive relief and damages for the Defendants' alleged willful acts of trademark infringement, false designation of origin, unfair competition, and trademark dilution, arising out of the Defendants' alleged distribution and sale within the United States of Marlboro brand cigarettes that were previously designated for export and retail sale outside the United States ("foreign Marlboros"). Plaintiff now moves for a preliminary injunction to prevent the Defendants from distributing or selling foreign Marlboros in the United States. In support of its motion, Plaintiff contends that the foreign Marlboros allegedly sold and distributed by the Defendants are materially different from the Plaintiff's domestically sold Marlboro products ("domestic Marlboros") and, thus, violate federal trademark law. The Defendants respond that (1) Plaintiff's claim is without legal merit, (2) Plaintiff has failed to demonstrate that it will suffer irreparable harm if a preliminary injunction is not entered, and (3) the balance of the harms and the public interest weigh against entering a preliminary injunction. Based on a ten hour evidentiary hearing held on April 26, 1999 and a thorough review of the parties' submissions, Plaintiff's Motion for a Preliminary Injunction is *GRANTED* as to all Defendants, but with specific exceptions as to Defendant Kocolene, for the reasons discussed below.

### I. BACKGROUND

Plaintiff manufactures domestic Marlboros and owns the trademarks to the Marlboro mark and "roof" device in the United States.[1] (Olga Nedeltscheff Aff. ¶ 4–5.) Plaintiff is also a contract manufacturer of cigarettes for an affiliated company, Philip Morris Products, Inc. (PMP), which distributes and sells foreign Marlboros.[2] (*Id.* at ¶ 7.) PMP owns trademarks to the Marlboro mark and roof device in jurisdictions outside the United States. (*Id.* at 4–5.)

Defendants Blue Grass Distributors, Inc., Brian Cooper (an owner of Blue Grass) AF & E, Inc. and Joe Melton (an owner of AF & E), have been purchasing foreign Marlboros from unknown sources and distributing them in the United States to various retail outlets. Defendant Kocolene Marketing Group, Inc. ("Kocolene"), has been purchasing foreign Marlboros

---

1. The roof device is a red, five-sided figure that appears on every pack of Marlboro cigarettes.

2. The relationship between the two companies is not fully developed in the record. It appears that they may, however, both be subsidiaries of Philip Morris Companies, Inc.

from Allen Distributors, Inc.[3] and in turn selling the cigarettes at its Indiana and Kentucky retail outlets.

The foreign Marlboros sold and distributed by the Defendants differ from domestic Marlboros in several ways. First, unlike their domestic counterparts, the foreign Marlboros do not contain Marlboro "Miles" Universal Product Codes (UPC). (Michael Mahan Aff. ¶ 10.) In 1992, the Plaintiff introduced its first Marlboro continuity merchandise redemption program called "Miles." (*Id.* at ¶ 7.) This program allows consumers to accumulate what are known as "Miles" by saving UPC's located on the side panels of all domestic Marlboros. (*Id.*) Once accumulated, these "Miles" may be redeemed for various merchandise available from catalogues issued by the Plaintiff. Since the program's inception, the Plaintiff has received over 30 million redemption requests, redeemed over 57 billion "Miles," and delivered over 115 million items of merchandise to participating consumers. (*Id.* at ¶ 12.)

The foreign Marlboros sold and distributed by the Defendants also are not subject to Plaintiff's quality control program which applies only to the authorized distribution of domestic Marlboros. (Randall Lawrence Aff. ¶ 8.) Under this program, "Philip Morris USA [the Plaintiff] representatives routinely visit wholesalers and retailers to inspect Philip Morris USA products [domestic Marlboros]. If, through such inspections, products are found to be damaged or otherwise substandard, they are removed and replaced with new products." (*Id.*) Tobacco products can easily become stale and absorb unpleasant odors around it, so proper storage and quality control is especially important. (Randall Lawrence Testimony at Preliminary Injunction Hearing). Plaintiff concedes that for reasons of impracticality its quality control program cannot and

does not reach the smallest retailers of its product.

The foreign Marlboros also differ from the domestic version by including the phrase "U.S. Tax Exempt For Use Outside U.S." and using the PMP name on the packs instead of Philip Morris, Inc. Notably, however, the cigarettes, themselves, are exactly the same.

On March 12, 1999, the parties appeared for a scheduled hearing on Plaintiff's motion for a temporary retraining order. Prior to the hearing, the parties had engaged in settlement negotiations, the results of which prompted Philip Morris to withdraw its motion. Philip Morris subsequently renewed its request for preliminary injunctive relief as to the Defendants now before the Court, which request we now address.

## II. *PRELIMINARY INJUNCTION STANDARDS*

To obtain a preliminary injunction, the movant must establish that: (1) it has a reasonable likelihood of success on the merits of its claim; (2) it will suffer irreparable harm if injunctive relief is denied; (3) the irreparable harm it will suffer without injunctive relief outweighs the irreparable harm the nonmoving party will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998). Applicants for preliminary relief face threshold burdens to demonstrate the first two factors: they must show that they have some likelihood of success on the merits and that they will suffer irreparable harm if the requested relief is denied. *In re Forty–Eight Insulations, Inc.,* 115 F.3d 1294, 1300 (7th Cir.1997). In a trademark infringement claim, a likelihood of success exists if the party seeking the injunctive relief demonstrates that it has a "better than negligible" chance of succeeding on

---

**3.** Allen Distributing, Inc., Allen Food Mart, Inc., Richard Allen, and Cindy Allen were originally defendants in this case, but recently they settled with the Plaintiff.

the merits of the underlying infringement claim. *Id.; Curtis v. Thompson,* 840 F.2d 1291, 1296 (7th Cir.1988).

█ If the movant can make these threshold showings, the court then moves on to balance the relative harms considering all four factors using a "sliding scale" approach. *In re Forty–Eight Insulations, Inc.,* 115 F.3d 1294, 1300 (7th Cir.1997). In assessing and weighing the competing considerations, "the district court has to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal intuitive sense about the nature of the case." *Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1453 (7th Cir.1995) (*quoting Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1436 (7th Cir.1986)); *see also Abbott Lab. v. Mead Johnson & Co.,* 971 F.2d 6, 12 (7th Cir.1992) (characterizing district court's preliminary injunction analysis as "subjective and intuitive").

## III. *DISCUSSION*

Plaintiff requests that we enjoin the Defendants from selling or distributing foreign Marlboros until a trial on the merits. Not surprisingly, the Defendants oppose the request.

### (1) *Likelihood of Success on the Merits*

Plaintiff alleges that the Defendants violated Sections 32(1)(a) and 43(a) of the Lanham Act by selling and distributing

foreign Marlboros which differ materially from the domestic version. The Defendants rejoin that (1) the Lanham Act does not apply to the facts of this case, and (2) even if it does, the Defendants have not infringed because the foreign and domestic Marlboros do not differ materially.

### a) *Does the Lanham Act Apply to this Case?*

█ We address as the first issue whether the Lanham Act applies in this case, keeping in mind that we are dealing with non-altered goods which were manufactured by an authorized trademark holder. Section 32(1)(a) of the Lanham Act provides the registered owner of a trademark with a cause of action against anyone who without its consent uses a "reproduction, counterfeit, copy, or colorable imitation" of the mark in such a way as "is likely to cause confusion, or to cause mistake, or to deceive."[4] Similarly, section 43(a) provides for civil liability if goods are marketed bearing "a false designation of origin."[5] These sections of the Act have been construed to apply in situations where foreign manufactured goods, for which a valid United States trademark has been registered, are legally purchased abroad and imported into the United States without the consent of the American trademark holder. *See, e.g., Iberia Foods Corp. v. Romeo,* 150 F.3d 298 (3d Cir. 1998); *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.,* 112

4. Section 32(1)(a) prohibits the
 use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered trademark in connection with the sale, offering, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

5. Section 43(a)(1) provides that:
 any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of

fact, or false or misleading representation of fact, which—
 (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
 (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, ·
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

F.3d 1296, 1303 (5th Cir.1997). These are the so-called "gray goods" cases. Defendants contend that this case is not properly construed as a gray goods case and, hence, the Lanham Act should not apply because (1) the domestic and foreign trademark holders (the Plaintiff and PMP) are affiliated companies, and (2) the foreign Marlboros are manufactured in the United States. Plaintiff rejoins that neither the affiliation between the trademark owners nor the fact that foreign Marlboros are manufactured domestically takes this case outside the scope of the Lanham Act.

■ The classic gray goods case involves foreign trademarked products which are manufactured abroad by a foreign licensee who is not otherwise affiliated with the United States trademark holder.[6] This obviously is not our case. Here, the foreign trademark holder and the domestic trademark holder are affiliated companies located in the United States and all the goods involved are manufactured in the United States as well. Whether the corporate affiliation between the domestic and foreign trademark holders or the fact that the foreign Marlboros are manufactured by the Plaintiff in the United States renders the Lanham Act inapplicable is far from clear, however. Given the muddy legal waters, a brief review of the history of gray market goods under trademark law is worthwhile.

Prior to 1923, the courts followed a "universality" principle of trademark rights under which goods lawfully made under a trademark in one country, could be imported and sold in another country, without infringing the rights of the domestic trademark owner. *See, e.g., Fred Gretsch Mfg. Co. v. Schoening*, 238 F. 780, 781–82 (2d

Cir.1916); *Apollinaris Co. v. Scherer*, 27 F. 18 (S.D.N.Y.1886). Under this view, the source of the goods identified by a trademark is thought to be the original manufacturer, and thus no confusion can arise when genuine goods bearing the mark are imported into the United States. However, in *A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), the Supreme Court ruled in favor of a plaintiff who had purchased the domestic business, good will, and trademark registrations of the French manufacturer of JAVA face powder and later sued a defendant who imported for sale genuine JAVA powder purchased in France. The Supreme Court rejected the "universality" principle in favor of a "territoriality" principle that recognizes a separate legal existence for a trademark in each country whose laws afford protection to the mark. Under this view, the trademark does not necessarily identify to purchasers in a particular country the original manufacturer of the goods, but may instead identify the company that owns exclusive trademark rights within that country. *See* Shira Yoshor, *Competing in the Shadowy Gray: Protecting Domestic Trademark Holder From Gray Marketeers Under the Lanham Act*, 59 U.Chi.L.Rev. 1363, 1370 (1992).

The scope and meaning of the territoriality principle announced in *Katzel* remain unclear. The broadest interpretation recognizes independent trademark rights in the domestic owner by operation of law, and any importation and sale of materially differing gray market goods without the domestic owner's consent would thus be an infringement, without regard to affiliation between the trademark holders. *See, e.g.,*

---

**6.** Plaintiff cites several gray goods cases applying the Lanham Act. *See, e.g., Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633 (1st Cir.1992); *Original Appalachian Artworks, Inc., v. Granada Elecs., Inc.*, 816 F.2d 68 (2d Cir.1987); *PepsiCo. v. Torres*, 27 U.S.P.Q.2d 1948, 1993 WL 455222 (C.D.Cal. 1993); and *Pepsico Inc. v. Giraud*, 7 U.S.P.Q.2d 1371, 1988 WL 391511 (D.Puerto

Rico March 14, 1988). In all of these cases, however, the foreign and domestic trademark holders were not affiliated companies. Rather, they had licensee/licensor relationships. These cases, therefore, do not assist us in determining whether the affiliation between the Plaintiff and PMP renders the Lanham Act inapplicable.

*Lever Brothers Co. v. United States*, 981 F.2d 1330, 1338 (D.C.Cir.1993) (*"Lever II "*); *Lever Brothers Co. v. United States*, 877 F.2d 101, 111 (D.C.Cir.1989) (*"Lever I "*). Some cases, limiting the *Katzel* decision more closely to its facts, have held instead that when the domestic trademark owner and the foreign trademark owner are affiliated, gray market sales do not infringe. *See, e.g., NEC Electronics, Inc. v. CAL Circuit Abco*, 810 F.2d 1506 (9th Cir.1987).

The Ninth Circuit in *NEC Electronics* limited the *Katzel* decision by examining what it believed were the two rationales fueling the decision. According to the Ninth Circuit, the first rationale was that the American company that acquired the mark had paid for the right with the understanding that the manufacturer could not sell the goods directly in this country. The Court was not prepared to permit the manufacturer to evade this restriction by selling to middlemen abroad. The second rationale was that the American company had become the true source of the trademarked goods in the United States, and the value of its trademark could have been entirely destroyed by the importation of foreign-purchased goods whose quality and contents were beyond its control. Both of these rationales, according to the Ninth Circuit, "presuppose the American owner's real independence from the foreign manufacturer." *NEC Electronics*, 810 F.2d at 1509. Hence, when the trademark holders are affiliated the doctrine of territoriality does not apply, according to the Ninth

Circuit.[7] Rather, the first sale doctrine applies, which says that "[o]nce a trademark owner sells his product, the buyer may resell the product under the original mark without incurring any trademark liability." *Id.; see also Sebastian Int'l. Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073 (9th Cir.1995).

By contrast, the D.C. Circuit in the *Lever Brothers* cases expressly rejected the notion that an affiliation between trademark holders, in itself, renders the Lanham Act inapplicable, holding that:

On its face ... section [42] [of the Lanham Act] appears to aim at deceit and consumer confusion; when identical trademarks have acquired different meanings in different countries, one who imports the foreign version to sell it under that trademark will (in the absence of some specially differentiating feature) cause the confusion Congress sought to avoid. The fact of affiliation between the producers in no way reduces the probability of that confusion; it is certainly not a constructive consent to importation.

*See Lever Brothers Co. v. United States*, 981 F.2d 1330, 1338 (D.C.Cir.1993) (*"Lever II "*) *Lever Brothers Co. v. United States*, 877 F.2d 101, 111 (D.C.Cir.1989) (*"Lever I "*).[8] This reasoning is consistent with the leading commentators in the area who similarly reject the notion that affiliation between the foreign and domestic trademark holders bars Lanham Act applicability. *See*

7. *NEC Electronics* would be completely on point if not for the fact that the goods involved in that case were identical. (In the case at bar, the goods have some differences, as discussed more fully *infra*.). The Central District of California in *Summit Technology, Inc. v. High–Line Medical Instruments Company, Inc.*, 922 F.Supp. 299 (C.D.Cal.1996), however, did not find that distinction relevant when it relied on *NEC Electronics* in holding that the Lanham Act did not apply where the foreign and domestic trademark holders were the same entity, even though the goods involved were materially different. By contrast, both the D.C. Circuit and the Fifth Circuit have relied on the fact that the goods were

identical in *NEC Electronics* to distinguish that case from cases involving gray market goods that differ materially. *See Lever Brothers Co. v. United States*, 877 F.2d 101 (D.C.Cir. 1989) ("Lever I"); *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296 (5th Cir.1997).

8. While the D.C. Circuit analyzed the case under section 42, its analysis is equally applicable to a case brought under sections 32 or 43(a), such as ours. *See* 4 McCarthy on Trademarks and Unfair Competition § 29:51.2 (4th ed.1997).

4 McCarthy on Trademarks and Unfair Competition § 29:51.2 (1997); Restatement (Third) of Unfair Competition § 4 cmt (1995).

The courts are in obvious disagreement over the relevance of an affiliation between the foreign and domestic trademark holders in trademark infringement cases. At this stage the parties have not fully developed all the relevant considerations on this complex issue, including possible antitrust questions. The Plaintiff, however, has demonstrated a better than negligible likelihood that the affiliation between the Plaintiff and PMP will not foreclose the applicability of the Lanham Act. Hence, Plaintiff's request for preliminary injunctive relief does not fall on these grounds and we continue with our analysis.

In addition to the affiliation between the Plaintiff and PMP, the Defendants also contend that the Lanham Act does not apply because the foreign Marlboros were manufactured in the United States, not abroad. According to the Defendants, gray goods cases involve only *"foreign-manufactured* good[s], bearing a valid United States trademark, that [are] imported without the consent of the United States trademark holder." *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 285, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988) (emphasis added). While the Defendants' quotation from *K Mart* is accurate, they fail to explain why it matters that foreign Marlboros are manufactured domestically, rather than overseas. The Supreme Court in *K Mart* did not emphasize that qualifier, nor was it deemed relevant in that case. Thus, while the fact that foreign Marlboros are manufactured in the United States casts some doubt on the viability of Plaintiff's claim, it does not push it below the

"better than negligible chance of success" threshold.

b) *Are the Defendants in Violation of the Lanham Act?*

Since Plaintiff has established a better than negligible chance of applying the Lanham Act to this case, the next step, of course, is to determine whether the Defendants' actions constitute infringement. The key inquiry under sections 32(1)(a) or 43(a) of the Lanham Act is whether Defendants' activities are likely to cause consumer confusion. In a gray goods case, that determination is made based on whether the foreign product is materially different from the domestic version. *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 640 (1st Cir.1992) (citation omitted) ("whether the fulcrum of plaintiff's complaint is perceived as section 32(1)(a), section 42, or section 43(a), liability necessarily turns on the existence *vel non* of material differences between the products of the sort likely to create consumer confusion"); *see also Iberia Foods Corp. v. Romeo,* 150 F.3d 298, 302 (3rd Cir.1998); *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA,* 112 F.3d 1296, 1302 (5th Cir.1997); *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 640 (1st Cir.1992); *Lever Brothers Co. v. United States,* 877 F.2d 101, 109 (D.C.Cir.1989); *Original Appalachian Artworks, Inc. v. Granada Elecs., Inc.,* 816 F.2d 68 (2d Cir.1987).[9]

■■ Whether a difference is material for Lanham Act purposes turns on whether consumers likely would consider the difference to be relevant when purchasing a product. *Societe Des Produits Nestle,* 982 F.2d at 641. "Any higher threshold

---

**9.** In a traditional trademark case, that determination would be made by considering these factors: (1) the strength of plaintiff's mark or trade dress; (2) the degree of similarity between the parties' marks; (3) the similarity of the products for which the mark is used; (4) the identity of retail outlets and purchasers; (5) the defendant's intent in adopting the mark; and (6) existence of actual confusion.

*See Thomas & Betts Corp. v. Panduit Corp.,* 138 F.3d 277, 296 (7th Cir.1998). Upon review, it is clear that these factors were not designed for a gray market case. Although the Seventh Circuit has not had occasion to address the application of the Lanham Act to gray goods, many other circuits have and in doing so have applied the material differences standard discussed above.

would endanger a manufacturer's investment in product goodwill and unduly subject consumers to potential confusion by severing the tie between a manufacturer's protected mark and its associated bundle of traits." *Id.* Even so, "when the differences between the products prove so minimal that consumers who purchase the alleged infringer's goods 'get precisely what they believed that they were purchasing,' consumers' perceptions of the trademarked goods are not likely to be affected by the alleged infringer's sales." *Iberia Foods Corp. v. Romeo,* 150 F.3d 298, 303 (3d Cir.1998) (*quoting Weil Ceramics and Glass, Inc. v. Dash,* 878 F.2d 659, 672 (3d Cir.1989)). Hence, such minimal differences do not provide the basis for liability under the Lanham Act. *Id.*

■ Against this standard, we must hold that the foreign Marlboros sold and distributed by the Defendants differ materially from domestic Marlboros because the foreign Marlboros (1) do not include "Miles", and (2) are not subject to the Plaintiff's quality control program.[10] Although not required to do so, the Plaintiff has presented evidence which buttresses this conclusion to the effect that consumers have complained about mistakenly purchasing foreign, Marlboros, only to be disappointed by the absence of Miles and the poor quality of the stale products. This evidence supports Plaintiff's contention that the Miles program and the quality control differences are material.

### c. Conclusion: Plaintiff Hurdles Likelihood of Success Barrier

Serious questions remain about whether the Lanham Act applies in a case like ours where the trademark holders are affiliated companies and the foreign goods are manufactured in the United States by the domestic trademark holder. However, as we previously held, Plaintiff has demonstrated a "better than negligible chance" that the Lanham Act does apply and, assuming it applies, the Plaintiff has shown a relatively strong case of infringement. Accordingly, the Plaintiff has successfully hurdled the "likelihood of success" threshold. We note, however, in conclusion, that the likelihood of success factor is by no means overwhelmingly in Plaintiff's favor.[11]

### (2) *Irreparable Injury*

Next, we address whether Plaintiff has established that it would be irreparably harmed if a preliminary injunction were not issued. The Defendants contend that Philip Morris delayed in requesting preliminary injunctive relief and, consequently, cannot demonstrate that it would be irreparably harmed if preliminary injunctive relief is denied.

**10.** However, other differences cited by the Plaintiff, including the use of the PMP name instead of the Philip Morris, Inc., are not material, since they are not likely to affect consumers' expectations.

**11.** In its brief in support of its motion for preliminary injunction, the Plaintiff also cites the Federal Trademark Dilution Act as a source of support, in addition to Sections 32 and 43 of the Lanham Act. *See* 15 U.S.C. § 1125(c). Plaintiff, however, fails to elaborate on this claim or how the analysis differs (if at all) from the other Lanham Act analysis. The Act was passed in 1995 to a to protect "famous" trademarks against uses that were non-competing but that nevertheless blurred or diluted the distinctiveness of the famous trademarks. *See Nike, Inc. v. Nike Securities,*

1999 WL 98346, *2, No. 97–C–008 (N.D.Ill. Feb. 19, 1999). Examples of such non-competing uses would include "DuPont shoes, Buick aspirin, and Kodak pianos." *Viacom Inc. v. Ingram Enterprises, Inc.,* 141 F.3d 886, 889 (8th Cir.1998) *quoting* 141 CONG.REC. H14317 (statement of Rep. Moorhead). Such uses did not qualify as "classic" trademark infringement because they were non-competing. *See Circuit City Stores, Inc. v. OfficeMax, Inc.,* 949 F.Supp. 409, 412 (E.D.Va.1996). On its face, it does not appear that the Federal Trademark Dilution Act strengthens Plaintiff's claim. At this time, however, the issue has not been properly presented to the court, as the parties have merged the issue together with the other Lanham Act analysis.

■ The Seventh Circuit has frequently acknowledged the well-established presumption that injuries arising from Lanham Act violations are by their very nature irreparable and not susceptible to an adequate measurement for a remedy at law. *See Abbott Laboratories v. Mead Johnson Company,* 971 F.2d 6, 16 (7th Cir.1992); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1091 (7th Cir.1988). That presumption, however, may be defeated with a showing that the plaintiffs delay in requesting preliminary injunctive relief "lulled [the defendant] into a false sense of security or ... [the defendant] acted in reliance on the plaintiff's delay." *Vaughan Manufacturing Co. v. Brikam International, Inc.,* 814 F.2d 346, 351 (7th Cir.1987). Delay, in itself, however, does not preclude the finding of irreparable injury in a trademark case in this circuit. *See id.* (rejecting defendant's argument that plaintiff's eight-month delay after notice of infringement bars preliminary injunction); *Ideal Industries, Inc. v. Gardner Bender, Inc.,* 612 F.2d 1018, 1025 (7th Cir.1979).[12]

■ Although the Defendants have alleged that Philip Morris' delay caused them to rely to their detriment by investing further in the business of selling foreign Marlboros, (*see* Cooper Aff. ¶ 18–20), a five-month delay is neither substantial nor egregious, particularly when at least a month of that delay is attributable to the time necessary to investigate the defendants.[13] Moreover, statements allegedly made by Philip Morris representatives to the Defendants to the effect that they would do the same thing (i.e. sell foreign Marlboros if they were one of the Defendants) did not provide the Defendants with a reasonable basis to believe that Philip Morris approved of its actions, particularly given Philip Morris correspondence sent to Defendants which made it patently clear that the company was prepared to go to great lengths to halt the sale of foreign Marlboros.

■ The Defendants also ask us to consider that (1) Philip Morris has known about the sale of foreign Marlboros in the United States by third parties since the early nineties and has done little, if anything, about it, and (2) enjoining the Defendants will not cut the supply of foreign Marlboros because of the existence of so many other suppliers. Neither contention carries the day. First, courts have consistently held that the existence of other infringers, and thus other non-genuine goods, does not prevent a trademark owner from seeking relief from one infringer. *See Warner–Lambert Co. v. Northside Development Corp.,* 86 F.3d 3, 7 (2d Cir. 1996); *Cullman Ventures, Inc. v. Columbian Art Works, Inc.,* 717 F.Supp. 96, 126–27 (S.D.N.Y.1989). In addition, Philip

---

**12.** By contrast, the Second Circuit permits delay alone to preclude a showing of irreparable injury. *See Tough Traveler, Ltd. v. Outbound Products,* 60 F.3d 964, 968 (2d Cir. 1995) (delay may, "standing alone, preclude the granting of preliminary injunctive relief.").

**13.** Defendants also claim that the doctrines of laches and acquiescence foreclose the Plaintiff's claim based on the delay discussed above. A few months of delay is not sufficient to constitute laches. *See Piper Aircraft Corp. v. Wag–Aero, Inc.,* 741 F.2d 925 (7th Cir.1984) ("two years has rarely, if ever, been held to be a delay of sufficient length to establish laches" in a trademark case.). Whereas laches is a negligent, unintentional failure to protect trademark rights, acquiescence is associated with intentional abandonment. *Id.* Where silence is the basis of alleged acquiescence, the doctrines of acquiescence and laches blend together. *Id.* Consistent with that notion, we should reject the Defendants' acquiescence defense as well. *Id.* (rejected acquiescence defense which was based on two year silence and one implied expression of acquiescence).

A rejection of laches and acquiescence does not control our decision regarding delay in the irreparable injury context. "Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *See Citibank, NA v. Citytrust,* 756 F.2d 273, 276 (2d Cir. 1985).

Morris executives testified during the preliminary injunction hearing that the company has been taking a number of steps to stop the sale of foreign Marlboros in the United States since discovering that such activity was taking place.

Accordingly, the Plaintiff has established sufficient irreparable injury to satisfy the threshold requirement. However, similar to our assessment of the likelihood of success prong, the showing by the Plaintiff is sufficient, but by no means overwhelming.

### (3) *Balance of Hardships*

Since Philip Morris has made a showing sufficient to satisfy, the threshold requirements of likelihood of success and irreparable injury, we now engage in a "sliding scale" analysis in an effort to assess the balance of harms between the parties and in consideration of the public interest. *See Roth v. Lutheran General Hospital,* 57 F.3d 1446, 1453 (7th Cir.1995).

Both sides have much at stake in the outcome of this ruling. At least one of the defendants—AF & E—might well be forced out of business altogether by a preliminary injunction because its sole business is the sale and distribution of foreign Marlboros; the other defendants certainly would at least sustain a heavy financial blow. Brian Cooper, for example, in addition to owning Blue Grass Distributing (which, according to the representations of its counsel, recently went out of business), has a substantial ownership interest in a chain of Kentucky retail tobacco outlets which sell foreign Marlboros under the name Butts and Ashes. Enjoining Cooper from selling and/or distributing foreign Marlboros would impact both that business and Cooper personally. Similarly, Kocolene, with inventory valued in excess of $300,000 of foreign Marlboros which it recently purchased from Allen Distributing Company (formerly a defendant in this lawsuit), will be significantly impacted by a preliminary injunction which would result in substantial storage costs, assuming the product survives the inevitable deterioration of quality and ultimate marketability. (*See* Randal Lawrence Testimony at Preliminary Injunction Hearing Regarding Delicate Nature of Tobacco Products.)

At the same time, however, Plaintiff stands to suffer significantly if a preliminary injunction is not entered. The Marlboro and red roof device trademarks are extremely valuable commodities whose value derives from the good will that customers associate with those marks. Infringing those marks erodes that good will by confusing consumers, perhaps causing them to associate the trademarks with undesirable characteristics, such as a lack of "Miles" or poor quality. Money damages cannot adequately compensate such a loss—a loss which goes straight to the heart of Plaintiff's business.

The public interest in this litigation must also be considered. There is, of course, a public interest in preserving a free and open market, but that interest is to be balanced against the consumer's interest in not being deceived by a defendant's improper use of a trademark. Typically, the public's interest against consumer confusion prevails when balanced against the interest in a free market, a recognition endorsed by the Seventh Circuit in *International Kennel Club v. Mighty Star, Inc.,* 846 F.2d 1079, 1092 n. 8 (7th Cir.1988).

■ Based on the evidence before us, we find that the balance of harms weighs in Plaintiff's favor as to Defendants Blue Grass Distributing, Inc., Brian Cooper, AF & E, Inc., and Joe Melton. To be sure, the harm these Defendants will experience from the issuance of a preliminary injunction is mitigated by the fact that they have been shown to have wilfully engaged in infringing activity without apparent regard to customer confusion. The mitigated harm that these Defendants suffer ultimately is outweighed by the harm to Plaintiff's good will and the public interest in halting consumer confusion. Accordingly, Plaintiff's Motion for Preliminary Injunction is *GRANTED* as to those Defendants.

█ Defendant Kocolene contends that it should not be similarly enjoined because Plaintiff comes before the Court with unclean hands with respect to Kocolene. Unclean hands has been recognized as a defense to a preliminary injunction in a Lanham Act case and may justify denying such an injunctive request. *See The Original Great American Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 281 (7th Cir.1992); *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir.1997). The defense is premised on the notion that "[o]ne who has defrauded his adversary to his injury in the subject matter of the action will not be heard to assert a right in equity." *Id.* (citations omitted).

█ Kocolene maintains that it acquired the bulk of its current inventory of foreign Marlboros based on representations made by Philip Morris' representatives that Kocolene would be permitted to sell those cigarettes under a negotiated settlement arrangement. These representations were allegedly made during settlement discussions which took place in this courthouse on March 12, 1999. Under the alleged arrangement, Allen Distributing, Inc. (Allen), then a defendant in this action, which had previously been the distributor of foreign Marlboros to Kocolene, would sell off its existing inventory of foreign Marlboros to Kocolene and go out of the business of selling foreign Marlboros altogether. Although Kocolene does not claim that a final settlement agreement was reached, it does maintain that the parties had an agreement in principle, and that part of the agreement was that Kocolene would be permitted to purchase Allen's remaining inventory of foreign Marlboros to sell in Kocolene's retail outlets.

Based on its understanding of the March 12 settlement discussions, Kocolene entered into a written agreement dated March 18, 1999 with Allen Distributing in which Kocolene agreed to purchase Allen's existing inventory of foreign Marlboros. (*See* Myers' Testimony at Preliminary Injunction Hearing; Defendants' Exhibit KI). Kocolene then purchased approximately $300,000 worth of foreign Marlboros from Allen pursuant to that agreement. (*See* Defendants' Exhibits KE – KH). Unfortunately, prior to Kocolene's March 18 agreement with Allen, Philip Morris and Kocolene had not memorialized any of their understandings from the March 12 settlement discussions in writing. It was only after the March 18 agreement that the parties attempted to arrive at a written understanding, at which time it became clear that the parties interpreted the March 12 discussions differently.

Although we were advised by counsel for both Philip Morris and Kocolene at the end of the day on March 12, 1999 that an agreement in principle had been reached, with details to be worked out at a later date, no further details of that agreement were ever provided to the Court. Hence, we are left to examine the parties' assertions about their recollections to determine whether the discussions were simply misinterpreted or whether Philip Morris comes to us now with unclean hands.

Kocolene's counsel, Brian Welch, who was present during the March 12 discussions, submitted a verified objection to Plaintiff's motion in which he states that:

> the agreements reached between Philip Morris and the Allen Defendants, and the March 12 Agreement between Philip Morris and Kocolene, allowed Kocolene to, within a time to be determined, (1) sell its existing inventory of repatriated Philip Morris tobacco products, and (2) purchase from the Allen Defendants and resell to Kocolene's customers all of the existing Allen Defendant's inventory of repatriated Philip Morris tobacco products.

(Kocolene's Verified Objection at 2.) Although Philip Morris concedes that the idea of Kocolene purchasing Allen's inventory as part of a settlement agreement was discussed, the attorneys for Philip Morris claim that it never reached such an agree-

ment. Philip Morris' lead attorney in this litigation, Samuel Rosen, testifies specifically in his declaration that "[a]t no time during our discussions with Kocolene did we [Philip Morris] agree that Kocolene could purchase and resell additional re-imported products from Allen." (Rosen Dec. at ¶ 7.) This version of the March 12 discussions is consistent with the interpretations given by the other Philip Morris attorneys who were also present during those discussions. (See Tittle Dec. at ¶ 2; Greenberg Dec. ¶ 2; O'Rourke Dec. at ¶ 2.)

The March 12 settlement discussions were complicated and multilateral; not surprisingly, the parties attending those discussions have reasonable, albeit varying, accounts of what was said. It is undisputed among the parties, however, that they did not reach a final agreement and that additional details had to be finalized prior to reaching an agreement. While we find it difficult to believe that Kocolene entered into its agreement with Allen without Philip Morris making some representation that the arrangement had its approval, we also recognize that reasonable people can interpret the results of settlement discussions in very different ways. In the absence of a written understanding arising from those discussions, we are left with the varying interpretations of settlement negotiations which, at most, ended in an agreement in principle only, with various details yet to be determined. On these facts, we cannot say that Philip Morris comes before this Court with unclean hands.

 Although there is insufficient evidence to establish unclean hands, the fact that Kocolene's purchase of Allen's inventory of foreign Marlboros was at least in its eyes "innocent" and intended to be consistent with Philip Morris' settlement conditions is certainly relevant to our need to balance the harms.[14] The good faith

nature of Kocolene's purchase was underscored when Gary Myers, Kocolene's president, testified at the preliminary injunction hearing that he never would have entered into the agreement with Allen if he did not believe it was part of a settlement agreement with Philip Morris. To punish Kocolene for its good faith efforts to settle this dispute by prohibiting it from selling the inventory of foreign Marlboros it purchased from Allen would be unduly harsh and contrary to equitable principles underlying injunctive relief, particularly since Kocolene's reliance seems to have resulted, at least in part, from positive indications from Philip Morris that such an arrangement was agreeable.

We find that Kocolene, unlike the other Defendants, acquired the Allen's inventory of foreign Marlboros in good faith and not in willful violation of Philip Morris' asserted trademark rights. Therefore, we hold that Kocolene may sell off its existing inventory of foreign Marlboros which it acquired from Allen pursuant to their March 18, 1999 agreement as long as Kocolene distributes in its retail outlets a flyer (consistent with the specifications outlined in the Preliminary Injunction Order) at the time of sale to each customer purchasing the foreign Marlboros. The flyer is intended to lessen the harm to Plaintiff and to dispel any consumer confusion associated with the sale of the foreign Marlboros. After the current inventory has been depleted, no further purchases of foreign Marlboros are to be made for resale by Kocolene unless and until further order of the Court. We find that the balance of the harms tilts in favor of Plaintiff, but that the harms as to both Plaintiff and Kocolene can be and should be ameliorated in this fashion.

Accordingly, consistent with the above, Plaintiff's Motion for a Preliminary Injunction against all Defendants is *GRANTED*. However, Plaintiff's Motion for a Prelimi-

---

**14.** Plaintiff contends that the evidence of settlement discussions is inadmissible under Federal Rule of Evidence 408. We disagree; this evidence goes to the equities of this ruling and was not offered to prove the invalidity of Plaintiff's trademark claim.

nary Injunction against Kocolene is *GRANTED* with the limitation that it applies only to the sale or distribution of any foreign Marlboros that (1) Kocolene acquired beyond the March 18, 1999 Purchase Agreement with Allen Distributing, and (2) are not accompanied by the flyer described in our Preliminary Injunction Order.

## IV. CONCLUSION

Although our determinations have been in each respect a close call, the Plaintiff has managed to satisfy the likelihood of success and irreparable harms requirements necessary to prevail on its request for a preliminary injunction. As to Defendants Blue Grass Distributing, Brian Cooper, AF & E, Inc., and Joe Melton, Plaintiff has established that it has a better than negligible chance of succeeding on the merits of its claims, that it will suffer irreparable injury unless Defendants are enjoined, that it has no adequate remedy at law and that the balance of the harms also weighs in Plaintiff's favor. Hence, Plaintiff's Motion for Preliminary Injunctive Relief is *GRANTED* as to those Defendants. Similarly, Plaintiff's Motion for Preliminary Injunction is also *GRANTED* as to Kocolene, but only in-so-far as Kocolene may sell in and through its retail outlets the foreign Marlboros it acquired from anyone other than Allen Distributing, Inc., pursuant to their March 18, 1999 agreement, and as long as Kocolene distributes at the point of sale to any customer who purchases the foreign Marlboros a flyer consistent with the specifications outlined in the preliminary injunction Order.

As a final matter, "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Fed. R.Civ.P. 65(c). Given the severe financial burdens which might be experienced by the Defendants should this preliminary injunction be deemed at some future point to have been improvidently granted and in view of the lack of clear legal precedent with respect to certain issues in this case, we will require Plaintiff to post a $1 million surety bond with the Clerk of the Court.

## PRELIMINARY INJUNCTION ORDER

In accord with today's Entry in the above named cause, Defendants Blue Grass Distributors, Inc.; Brian Cooper; Kocolene Marketing Group, Inc.; AF & E, Inc.; and Joe Melton; and any of their members, officers, directors, trustees, agents, attorneys, and employees, and other persons or entities acting in concert with them (collectively, "Defendants and Agents"), and who receive actual notice of this Order, are hereby enjoined, pending final trial herein, from using on or in connection with any product or service or the manufacture, importation, sale, offering for sale, distribution, advertising, promotion, labeling or packaging of any re-imported product, or from using for any commercial purpose whatsoever in connection with re-imported product: (1) Plaintiff Philip Morris, Inc.'s MARLBORO or MARLBORO LIGHTS trademarks; and (2) Plaintiff's "roof" design trademark. Defendants and their Agents are similarly enjoined from representing by any means whatsoever, directly or indirectly, that any re-imported products sold by Defendants or their Agents are the same as the Plaintiff's USA products or from otherwise taking any action likely to cause confusion, mistake or deception on the part of purchasers as to the origin or sponsorship of Plaintiff's products, their quality or their value.

Notwithstanding the above, this Preliminary Injunction Order does not bar Defendant Kocolene Marketing Group, Inc. from selling in its retail outlets its existing inventory of the re-imported Marlboro product it acquired from Allen Distributing, Inc., pursuant to the March 18, 1999 Purchase Agreement between Kocolene and

Allen, so long as Kocolene distributes a notice in the form of a printed flyer to each customer at the time of sale who requests to purchase the foreign Marlboros containing language essentially as follows:

This package of Marlboro cigarettes is a re-imported product which was not originally intended for sale in the United States and has been distributed by a company unaffiliated with Philip Morris, Incorporated or Philip Morris Products. As such, this product:

(1) does NOT contain "Miles"; and

(2) is not subject to Philip Morris. Incorporated's quality control inspections or standards.

The above language must appear in type written, bold letters of no smaller print size than thirteen (13) font on a paper no smaller than 4′ × 6″ dimension, spaced in a manner as closely resembling as possible the format laid out above.